**NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE et al., Plaintiffs,**

v.

**The WILMINGTON MEDICAL CENTER, INC., et al., Defendants.**

**Civ. A. No. 76–298.**

United States District Court, D. Delaware.

Aug. 16, 1977.

---

See also D.C., 426 F.Supp. 919.

Joseph S. Flowers and Douglas A. Shachtman, Community Legal Aid Society, Inc., Wilmington, Del., and Marilyn G. Rose and Christine B. Hickman, Center for Law and Social Policy, Washington, D. C., for plaintiffs.

Charles H. Toliver, IV, and Alan Bernard Scher, Asst. City Sols., for plaintiff-intervenor, City of Wilmington.

Rodney M. Layton, Wendell Fenton and William J. Wade of Richards, Layton & Finger, Wilmington, Del., for defendants The Wilmington Medical Center, Inc., Crawford H. Greenewalt and Joseph A. Dallas.

James W. Garvin, Jr., U. S. Atty., Wilmington, Del., Barbara Allen Babcock, Asst. Atty. Gen., Dennis G. Linder and Rebecca L. Ross, Trial Attys., Dept. of Justice, Washington, D. C., Stephanie W. Naidoff, Regional Atty., and William M. Reinhart, Asst. Regional Atty., Dept. of HEW, Philadelphia, Pa., for defendant Secretary of HEW.

Malcolm S. Cobin, Asst. Atty. Gen., Dept. of Justice, Dover, Del., for defendant Amos Burke, Director of the Bureau of Comprehensive Health Planning.

William C. Gordon, pro se.

LATCHUM, Chief Judge.

Before the Court are cross-motions for partial summary judgment[1] filed by the defendant Secretary of Health, Education and Welfare (the "Secretary") and the plaintiffs directed to the issue of whether the Secretary's limited role in the implementation of Plan Omega under the provisions of § 1122 of the Social Security Act, 42 U.S.C. § 1320a–1, ("§ 1122") constitutes "major Federal action significantly affecting the quality of the human environment" as that phrase is found in § 102(2)(C) of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332(2)(C).

Plan Omega of the defendant Wilmington Medical Center ("WMC"), the major hospital system in northern Delaware, envisions the closing of two of the WMC's three hospital facilities, all now located in Wilmington, and the construction of a major suburban tertiary care facility approximately eight miles southwest of Wilmington. The plaintiffs, who represent classes

---

1. Docket Items 113 & 130; see Docket Items 23, 53, 73 & 74, par. 6. No facts material to the Court's decision are in dispute.

of minorities and handicapped persons residing primarily in Wilmington, oppose Plan Omega principally because they foresee a deterioration in the quality of health care available to them upon completion of Plan Omega.[2]

Congress, responding to a growing national concern for the protection of the environment, established its policy

> "to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."[3]

NEPA directs federal agencies to prepare detailed environmental impact statements before embarking upon major federal actions which significantly affect the quality of the human environment.[4] The preparation of an environmental impact statement canvassing the environmental consequences of the proposed action and alternatives to that action has two important salutary effects. First, an environmental impact statement gives the decision makers a readily available source of detailed information about the environmental consequences of the contemplated action and thereby forces them to give serious consideration to environmental factors in making discretionary choices. Second, an impact statement provides the public with environmental information and indirectly encourages greater public participation in the decision-making process.[5]

However, from the outset of this litigation, the Secretary has consistently maintained that his contact with Plan Omega under § 1122 did not require the preparation of an environmental impact statement. On January 19, 1977, the Court ordered the Secretary to reconsider his position particularly in light of his environmental guidelines and to report to the Court the grounds for his decision.[6] The Secretary, in his report[7] which now provides the Court with an adequate basis for review of his decision,[8] again concluded that an environmen-

---

**2.** The plaintiffs do have standing to present a claim under NEPA because they allege that Plan Omega will cause them environmental harm and because the rights they assert are arguably within the zone of interests protected by NEPA. *United States v. SCRAP*, 412 U.S. 669, 683–90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). *See* Supplemental Report to Court Concerning Review of Environmental Impact of Plan Omega, (Docket Item 103) pp. 15–16 (review by Secretary of Plan Omega's environmental impact on Wilmington).

**3.** § 101(a) of NEPA, 42 U.S.C. § 4331(a).

**4.** § 102 of NEPA, 42 U.S.C. § 4332, provides in pertinent part: "The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, . . . shall be made available to the President, the Council on Environmental Quality and to the public. . . ."

**5.** *Sierra Club v. Morton*, 510 F.2d 813, 819 (C.A. 5, 1975); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1282 (C.A. 9, 1974).

**6.** Docket Item 74, par. 4.

**7.** Docket Item 103.

**8.** *See, e. g., Krueger v. Morton*, 539 F.2d 235, 240–41 (C.A.D.C.1976); *Arizona Public Service Co. v. FPC*, 157 U.S.App.D.C. 272, 483 F.2d 1275, 1283 (1973).

tal impact statement was not required. Although acknowledging for the first time that Plan Omega would significantly affect the quality of the human environment, the Secretary persisted in asserting that his § 1122 role did not amount to "major federal action." Thus, the Secretary's review has narrowed the Court's task to deciding whether his role in the § 1122 review of Plan Omega involved "major federal action."

To understand the parties' arguments, it is first necessary to sketch the Secretary's powers and responsibilities under § 1122.

Recognizing that "sound health facility planning and the prudent use of capital funds [are critical to] controlling health costs," [9] Congress enacted § 1122 in order to

"assure that medicare, medicaid, and the maternal and child health programs are consistent with State and local health facility planning efforts, in order to avoid paying higher costs unnecessarily in the future where these costs result from duplication or irrational growth of health care facilities." [10]

Through § 1122 Congress sought to encourage, although it did not mandate, the development of comprehensive local health planning programs.

States voluntarily elect to participate in the § 1122 program. With the agreement of the Secretary, the State, in this case the defendant Bureau of Comprehensive Health Planning ("BCHP"), contracts with a local health planning group, in this case the defendant Health Planning Council ("HPC"), which studies the health care provider's proposed capital expenditure program. The local planning group considers, for example, whether the proposed project is necessary, whether the proposed project can be operated, whether the proposed project will be economically feasible, and whether costs will be contained or the quality of care will be improved as a result of the project. [11]

In general terms, § 1122 facilitates local health planning efforts by assuring a health care provider that if it obtains approval of its capital expenditures from the health planning agency designated under § 1122 and if it and the local planning agency follow the procedures set forth in § 1122 and its implementing regulations, [12] the Secretary will not reduce the compensation for services provided to medicare, medicaid, and maternal and child health care (collectively, "medicare") patients because *unreasonable* or *unnecessary* capital costs are reflected in the charges. [13] If ·the application has received complete approval when it reaches the Secretary, he then performs the ministerial act of assuring that the proper procedure has been followed. [14] The Secretary, however, has no discretion as to whether the proposed expenditures are unwise. [15]

9. 1972 U.S.Code Cong. & Adm.News, p. 5065.

10. *Id.*

11. 42 C.F.R. § 100.107.

12. 42 C.F.R. Part 100.

13. The payment of medicare funds is not guaranteed by the § 1122 review; the § 1122 process merely eliminates one possible ground for the reduction, but not the elimination, of medicare payments.

14. For example, the health care provider must give notice of its proposed capital expenditure "at least 60 days prior to obligation for such expenditure." § 1122(d)(1)(A). .
The Secretary, after review by an advisory council, can find that the capital component of medicare bills should be paid even if the local agency rejects the application of the health care provider. § 1122(d)(2). Because Plan Omega was approved by the planning groups, this potential exercise of discretion is not involved in this case.

15. § 1122(d); *see* 42 C.F.R. § 100.108. The plaintiffs have maintained that it is not necessary for the Court to consider the Secretary's discretion under § 1122. After oral argument they petitioned the Court for permission to file a memorandum on the issue. (Docket Item 138). The issue of discretion was raised by the Secretary early in the litigation (Docket Item 25, p. 4, November 3, 1976), and nothing that he has submitted since then gives any indication that he has abandoned that position. Therefore, plaintiffs have had adequate notice of the Secretary's position. Two oral arguments and two sets of briefs have been presented on the motions, and they are ready for decision.

On the other hand, failure to comply with the § 1122 procedure does not necessarily mean that the health care provider will not be compensated for its capital expenditures. Instead, the health care provider that proceeds without approval under § 1122 merely runs the risk that his judgment on the *need* for certain capital expenditures may be questioned after the facility is in service.

WMC, however, decided to follow the course set by § 1122, and the Secretary does not deny that the WMC, which receives approximately 35% of its patient revenues from medicare, would not proceed with Plan Omega without the assurances provided through § 1122.[16] The plaintiffs have estimated that bills submitted under medicare programs will initially include $3,000,000 per year that is attributable to the construction costs of Plan Omega which will not be fully depreciated for perhaps thirty years. Thus, as a practical matter at least from the viewpoint of the WMC, § 1122 approval by the Secretary was an essential link in the chain of events leading to the implementation of Plan Omega.

The Court must now turn to NEPA and the massive body of case law that it spawned to decide whether the Secretary must prepare an environmental impact statement for Plan Omega.

The concept of a "major federal action significantly affecting the quality of the human environment" has not proved readily susceptible to easy definition and application, and therefore, courts have found it necessary to analyze this issue on a case-by-case basis.[17] Initially, it must be determined whether a federal act which is a step in a process that could eventually lead to significant environmental effects must be considered a "major" action. Some courts, evidently fearing a frustration of Congress' environmental goals, have viewed the action-forcing language of NEPA as setting a unitary standard.

"By bifurcating the statutory language, it would be possible to speak of a 'minor federal action significantly affecting the quality of the human environment,' and to hold NEPA inapplicable to such an action. Yet, if the action has a significant effect, it is the intent of NEPA that it should be the subject of the detailed consideration mandated by NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment."[18]

■ However, other courts have adopted a two-pronged approach by distinguishing the major federal action test from the environmental effects test.[19] The two-pronged approach follows the statutory language more closely because the unitary interpretation, in effect, deletes the word "major" from NEPA's action-forcing provision. Also, Congress reasonably could have concluded that a minimal federal relationship with a project simply did not warrant the expenditure of scarce governmental resources for the preparation of an environmental impact statement. Finally, the advisory guidelines established by the Council on Environmental Quality advocate a multistep analysis.[20] Accordingly, the Court concludes that the "major federal action" concept is an independent standard for it to apply.

■ Although it is clear that the Secretary's decision not to prepare an environ-

**16.** See Docket Item 53A, ex. 7.

**17.** *Transcontinental Gas Pipe Line Corp. v. Hackensack Meadowlands Dev. Comm.,* 464 F.2d 1358, 1366 (C.A. 3, 1972), *cert. denied,* 409 U.S. 1118, 93 S.Ct. 909, 34 L.Ed.2d 701 (1973).

**18.** *Minnesota Public Interest Research Group v. Butz,* 498 F.2d 1314, 1321–22 (C.A. 8, 1974); *accord, City of Davis v. Coleman,* 521 F.2d 661, 673 n. 15 (C.A. 9, 1975); *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (C.A. 10, 1973); *cf. Simmans v. Grant,* 370 F.Supp. 5, 13 (S.D.Tex.1974).

**19.** *Scherr v. Volpe,* 466 F.2d 1027, 1033 (C.A. 7, 1972); *Hanly v. Mitchell,* 460 F.2d 640, 644 (C.A. 2, 1972), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972); *Natural Resources Defense Council, Inc. v. Grant,* 341 F.Supp. 356, 366–67 (E.D.N.C.1972); *see* Comment, 124 U.Pa.L.Rev. 250, 259–61 (1975).

**20.** 40 C.F.R. § 1500.6.

mental impact statement is reviewable,[21] the appropriate standard of review for the administrative decision has not been fixed. Some courts have applied the "arbitrary and capricious" test[22] while others have adopted a broader "reasonableness" standard[23] for reviewing negative decisions.[24] Part of the problem stems from the question of whether the negative decision is a matter of law or a matter of fact. Also, the existence of a two-pronged test complicates the issue. Although the environmental effects prong can be seen as involving a certain amount of agency discretion, the major federal action aspect comes closer to a question of law. The federal action is known; whether it is "major" is an issue that courts are properly equipped to resolve without the amount of deference to the agency that the arbitrary and capricious standard requires. Furthermore, close judicial scrutiny, enhanced by the broader reasonableness standard, reduces the opportunity for agencies to thwart the Congressional directives embodied in NEPA. In sum, the Secretary's decision refusing to prepare an environmental impact statement on Plan Omega will be reviewed under the "reasonableness" standard.[25]

The plaintiffs argue that the Secretary's § 1122 approval amounts to "major federal action" since it "enables"[26] the implementation of Plan Omega. First, because the WMC would not proceed with Plan Omega without approval under § 1122, plaintiffs contend that § 1122 is the equivalent of a permit. Second, plaintiffs assert that substantial federal financial assistance for Plan Omega is the inevitable result of the § 1122 review. Permits and financial obligations are two factors frequently considered in ascertaining the presence of major federal action.

When federal agencies issue permits which are required to engage in activities with environmental consequences, such as operating a nuclear power facility, environmental impact statements frequently must be prepared before the permits can be granted.[27] However, the typical permit case involves a private activity which cannot be carried on without federal permission. For example, in *Izaak Walton League v. Schlesinger*, 337 F.Supp. 287 (D.D.C. 1971), the nuclear power facility could neither be constructed nor operated without approval from the AEC, and therefore, the AEC could reasonably be charged with responsibility for the facility's environmental effects. No similar federal restriction prohibits the WMC from building and operating a new suburban hospital, and in fact, the WMC could receive full reimbursement

---

**21.** *E. g., Calvert Cliffs' Coordinating Comm., Inc. v. AEC*, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1115 (1971).

**22.** *E. g., Nucleus of Chicago Homeowners' Ass'n v. Lynn*, 524 F.2d 225, 229–30 (C.A. 7, 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Chelsea Neighborhood Ass'ns v. United States Postal Service*, 516 F.2d 378, 387 n. 23 (C.A. 2, 1975); *Union Mechling v. United States*, 390 F.Supp. 391, 410 (W.D.Pa. 1974).

**23.** *E. g., City of Davis v. Coleman, supra*, 521 F.2d at 673; *Minnesota Public Interest Research Group v. Butz, supra*, 498 F.2d at 1320; *Wyoming Outdoor Coordinating Council v. Butz, supra*, 484 F.2d at 1248–49; *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 465–66 (C.A. 5, 1973); *Township of Ridley v. Blanchette*, 421 F.Supp. 435, 445 (E.D.Pa.1976); *Conservation Council of North Carolina v. Costanzo*, 398 F.Supp. 653, 672 (E.D.N.C.1975), *aff'd*, 528 F.2d 250 (C.A. 4, 1975).

**24.** The Third Circuit recently refrained from resolving this issue. *Schiffler v. Schlesinger*, 548 F.2d 96, 104–05 n. 5 (C.A. 3, 1977).

**25.** *Transcontinental Gas Pipe Line Corp. v. Hackensack Meadowlands Dev. Comm., supra*, 464 F.2d at 1367, suggests that a reasonableness test should be applied to review a negative decision:

> "[T]he approval of the construction of the facility in question is certainly not the type of 'action' which most *reasonable* men could conclude . . . to be either 'major' or even an 'action'." (Emphasis added.)

**26.** *See National Forest Preservation Group v. Butz*, 485 F.2d 408, 411–12 (C.A. 9, 1973).

**27.** *E. g., Davis v. Morton*, 469 F.2d 593 (C.A. 10, 1972); *Greene County Planning Bd. v. FPC*, 455 F.2d 412, 418–19 (C.A. 2, 1972), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Conservation Council of North Carolina v. Costanzo, supra*, 398 F.Supp. at 671.

for medicare patients even if it had ignored the § 1122 procedure available to it.

Furthermore, in the typical permit case, the federal agency has discretionary powers to exercise. The § 1122 scheme does not allow the Secretary to reconsider the decision of the state and local planning agencies on the merits of the proposed project. If the Secretary cannot veto or redirect Plan Omega on health planning grounds, the very reason for enactment of § 1122, it is difficult to believe that Congress intended to append environmental responsibilities to the Secretary's ministerial role. Thus, plaintiffs have failed to persuade the Court that approval under § 1122 is the equivalent of a permit and, therefore, necessitates the preparation of an environmental impact statement.[28]

█ Also, direct federal financial commitments in the form of cash grants, loans, or mortgage insurance to activities with environmental consequences frequently must be preceded by the preparation of an environmental impact statement.[29] However, while § 1122 approval has limited financial significance for Plan Omega, it does not amount to direct federal financial involvement in the project.[30] By participating in the planning review procedure established pursuant to § 1122, WMC merely assured itself that medicare payments on behalf of its patients would not later be reduced because the hospital charges reflected an unnecessary capital expenditure. It must again be emphasized that § 1122 approval does not represent any federal financial commitment to Plan Omega either during the construction phase or after the new facility is in service. Although patients at any facility constructed or renovated under Plan Omega will most likely benefit from federal programs such as medicare, those benefits might have been fully provided even if the WMC had abjured participation in the § 1122 process. On the other hand, medicare assistance for patients at any facility constructed or renovated under Plan Omega might be eliminated entirely for any of several reasons including, for example, violation of certain health care or safety standards or discrimination against patients because of their race. Thus, § 1122 approval enhances slightly the likelihood that patients of the WMC will continue to receive medicare assistance after implementation of Plan Omega, but it is difficult to view § 1122 approval as a commitment of federal resources that would justify attributing responsibility for Plan Omega's environmental consequences to the Secretary and, thereby, forcing him to prepare an environmental impact statement.[31]

**28.** *See Milo Community Hospital v. Weinberger*, 525 F.2d 144 (C.A. 1, 1975); *cf. Edwards v. First Bank of Dundee*, 534 F.2d 1242 (C.A. 7, 1976).

**29.** *E. g., Proetta v. Dent*, 484 F.2d 1146, 1149 (C.A. 2, 1973); *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 698 (C.A. 2, 1972); *Wilson v. Lynn*, 372 F.Supp. 934 (D.Mass.1974).

**30.** The Court does not understand plaintiffs to suggest that the federal funds used in the § 1122 review process constitute major federal action. *See, e. g., Hawthorn Environmental Preservation Ass'n v. Coleman*, 417 F.Supp. 1091, 1099 (N.D.Ga.1976), *aff'd*, 551 F.2d 1055 (C.A. 5, 1977); *James River & Kanawha Canal Park, Inc. v. Richman Metropolitan Authority*, 359 F.Supp. 611, 636 n. 72 (E.D.Va.1973), *aff'd per curiam*, 481 F.2d 1280 (C.A. 4, 1973).

**31.** Plaintiffs point to the Secretary's admission that direct federal payments for hospital construction projects under the Hill-Burton program, 42 U.S.C. § 291, may require the filing of an environmental impact statement. (Docket Item 42, No. 17(a)). Evidently, environmental impact statements seldom accompany Hill-Burton grants. (*See* Docket Item 132, par. 15). The plaintiffs contend that § 1122 approval leads to ultimate federal reimbursement of construction costs as surely as a Hill-Burton grant leads to federal payment of construction costs. This analogy to Hill-Burton support, plaintiffs argue, establishes the existence of major federal action. However, the difference between a direct construction grant and reimbursement for services, which include a charge for the underlying capital costs, rendered after the facility is in operation is significant. More important is the failure of plaintiffs to acknowledge the simple fact that § 1122 approval does not guarantee any federal financial assistance. In addition, the purpose of the Hill-Burton program is the federal funding of hospital construction; the purpose of § 1122 is to support local health planning efforts and, consistent with that goal, the role of the Secretary is

■ Accordingly, the Court concludes that the Secretary did not act unreasonably in determining that § 1122 approval does not constitute major federal action [32] and in not preparing an environmental impact statement as part of his processing of Plan Omega's § 1122 application.[33]

■ The Court's holding that the Secretary need not prepare an environmental impact statement on Plan Omega as a result of his § 1122 role is not inconsistent with the policies of NEPA. The fundamental purpose for preparing an environmental impact statement is to assure that federal decision makers consider the environmental consequences of their decisions.[34] Where the federal official has no decision to make which can be affected by environmental considerations, the principal goal of NEPA is hardly advanced by the preparation of an environmental impact statement.[35]

■ An environmental impact statement also can inform the public of the environmental consequences of contemplated actions; with this information, the public can exert pressure upon the appropriate officials. As a general matter, making the public aware of possible harm to the environment is a praiseworthy goal,[36] and to that end, issuance of environmental impact statements on state, local, private, or even non-major federal actions could be viewed as desirable. NEPA, however, is concerned only with major federal actions, and Plan Omega and its § 1122 review are not major federal actions. It was not a goal of NEPA to have environmental impact statements prepared on a project merely because there is some federal presence, and therefore, the legislative purpose behind NEPA is not thwarted by the lack of an environmental impact statement.

The plaintiffs also contend that the degree of overall federal involvement with the WMC and Plan Omega is so great that the actions of the WMC must be treated as federal actions.[37] If the actions of the WMC are federal and Plan Omega is a

---

minimal. Because of these differences in purpose and effect, the Court is satisfied that plaintiffs' analogy is inapt.

**32.** The Court has assumed, without deciding, that § 1122 approval is an "action" within the meaning of NEPA.

**33.** The Secretary also argues that the clash between NEPA and § 1122 eliminates the need for an environmental impact statement. In *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n*, 426 U.S. 776, 788, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976), the Supreme Court held that "where a clear and unavoidable conflict in statutory authority exists, NEPA must give way." In light of the Court's determination that no major federal action is present in this case, it is unnecessary for the Court to address this contention.

**34.** 115 Cong.Rec. (Part 30) 40416 (1969) (remarks of Senator Jackson); see text accompanying n. 5, *supra*.

**35.** A similar argument was advanced, but not decided, in *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n, supra*, 426 U.S. at 786, 96 S.Ct. at 2437:

"In petitioners' view, NEPA is concerned only with introducing environmental considerations into the decision making processes of agencies that have the ability to react to environmental consequences when taking action. If the agency cannot so act, its action

is not 'major' and does not fall within the statutory language. Thus, petitioners urge, NEPA should not be read to impose a duty on HUD to prepare an environmental impact statement in this case since the agency, by statute, has no power to take environmental consequences into account in deciding whether to allow a disclosure statement to become effective."

**36.** The Secretary's Supplemental Report to Court Concerning Review of Environmental Impact of Plan Omega (Docket Item 103; see text accompanying n. 7, *supra*) identifies for the public several potential environmental consequences of Plan Omega.

**37.** While not using the label, plaintiffs appear to draw on the "state action" doctrine. *E. g., Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974):

"[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the . . . [private] entity so that the action of the latter may be fairly treated as that of the State itself."

Whether the "state action" doctrine can be converted into a "federal action" doctrine for the assertion of federal statutory rights, as opposed to constitutional rights, is an issue which the Court does not consider.

major action of the WMC, then Plan Omega becomes a major federal action, according to plaintiffs.[38] The WMC receives substantial federal financial support on behalf of many of its patients, and the federal government conducts civil rights compliance reviews and insures compliance with certain safety and care-quality standards. Also, the § 1122 program is another indicium of federal presence in the operation of the WMC.

■ Plaintiffs have not supported their novel theory with any authority. The WMC is a private entity that provides medical services for patients entitled to federal financial assistance, and the federal government exercises some limited control over the quality of the health care provided and the manner in which it is delivered. Many of the requirements imposed upon the WMC are similar to the standards which any federal contractor must meet. In essence, the plaintiffs are urging upon the Court a new doctrine that would make federal the actions of most hospitals and many other entities that have traditionally been viewed as non-federal. The power which Congress has chosen to exercise over the WMC is not sufficient to make Plan Omega a federal project. In short, by its terms, NEPA applies only to "federal agencies" and cannot be extended to private organizations which carry on their activities in the presence of the federal government.[39]

An order will be entered in accordance with this opinion.

---

**38.** The plaintiffs do not specify whether the Secretary or the WMC should be charged, under their theory, with preparation of the environmental impact statement. If the WMC were treated as a federal agency for this purpose, as plaintiffs suggest, it would seem that the duty to prepare an environmental impact statement rests with the WMC as the agency most directly concerned with, and responsible for, the environmental impact. Plaintiffs' complaint, however, does not seek to order the WMC to prepare the environmental impact statement.

**39.** Cf. *Edwards v. First Bank of Dundee, supra; Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 327 (C.A. 9, 1975).