Nancy AVALLONE, Plaintiff,

v.

WILMINGTON MEDICAL CENTER,
INC., Defendant.

Civ. A. No. 80–459.

United States District Court,
D. Delaware.

Dec. 30, 1982.

William Thurston Barrett, Dover, Del., and Michael K. Simon, Philadelphia, Pa., of counsel, for plaintiff.

William J. Wade of Richards, Layton & Finger, Wilmington, Del., and Allen J. Gross and Michael J. Ossip of Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel, for defendant.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

Plaintiff, Nancy Avallone, originally filed this action against the Wilmington Medical Center, Inc. ("WMC"), her former employer, in the Superior Court of the State of Delaware in and for New Castle County on August 28, 1980. (Docket Item ["D.I."] 1.) The defendant thereafter removed that action to this Court on September 23, 1980, pursuant to 28 U.S.C. § 1441(b) because Counts VII and VIII were founded on alleged claims arising under the United States Constitution, namely a denial of plaintiff's rights under the First, Fifth and Fourteenth Amendments to the United States Constitution. (D.I. 1, ¶¶ 28 & 29.) The other counts of the complaint asserted six pendent state claims as follows: Count I—breach of contract; Count II—wrongful retaliatory discharge in violation of public policy;[1] Count III—libel and slander;

Count IV—defamation; Count V—intentional and/or negligent infliction of severe emotional distress; and Count VI—invasion of privacy. (D.I. 1.)

The defendant has moved to dismiss, pursuant to F.R.Civ.P. 41(b) and Local Rule 5.2, for failure to prosecute,[2] or in the alternative, for summary judgment under F.R. Civ.P. 56 on all remaining counts. (D.I. 39.)

### I. Plaintiff's Contentions.

The plaintiff was employed as a Registered Nurse by WMC from 1967 until 1971 when she was promoted to Head Nurse. (D.I. 9, ¶ 1.) She continued to work in that capacity until she resigned by letters dated July 11 and 20, 1978 (D.I. 9, ¶ 4, Ex. 3 & 4). According to plaintiff, WMC in the spring of 1978 instructed its employees, including the plaintiff, to use a new method of feeding patients called "drip tube feeding," which partially replaced the "syringe" method already in use. Plaintiff claimed that the new method required more time and greater supervision than the older method and she so warned the WMC of these drawbacks and the inherent dangers involved with drip feeding (D.I. 1, ¶¶ 10–17). Plaintiff contends that, as a reaction to her warnings, WMC through other of its employees, advised plaintiff to stop "making waves" and was given "a false negative job performance evaluation which suggested that plaintiff did not follow hospital policy and was an ineffective administrator." (Id. ¶ 18.) Plaintiff further alleges that the performance evaluation and its contents were disseminated by WMC to other unknown parties. (Id.). In addition, she contends that two of WMC's employees "threatened plaintiff with disciplinary action if she contested the negative 'evaluation' and if she failed to 'resign' from her

---

1. Count II was dismissed by this Court on June 29, 1981 (D.I. 26) based on the U.S. Magistrate's Report and Recommendation of May 14, 1982 (D.I. 18).

2. Prior to defendant's motion to dismiss, plaintiff had undertaken no action in this case for more than a year. Furthermore, plaintiff has not initiated any discovery, notwithstanding her counsel's representations to the Court, in response to WMC's original Rule 12(b)(6) motion to dismiss plaintiff's complaint, that plaintiff needed and intended to take discovery to preclude WMC's dismissal motion. (D.I. 14.) In view of the Court's ruling on the merits, it is unnecessary to consider WMC's dismissal motion for failure to prosecute.

head nurse position" (*id.,* ¶ 19), and that she was in fact forced to resign, effective August 30, 1978. (*Id.* ¶ 20.)

## II. *Counts VII and VIII—Constitutional Claims.*

As previously noted the complaint contains two counts alleging constitutional violations. In Count VII, plaintiff contends that WMC forced her resignation, solely in retaliation for her speech advising her superiors of the dangerous use of drip-tube feeding, in violation of her rights of freedom of speech guaranteed by the First and Fourteenth Amendments. (D.I. 1, ¶ 28.) In Count VIII, plaintiff alleges that by singling her out for dismissal and by dismissing her arbitrarily without a hearing, WMC denied her equal protection of law and due process of law in violation of the Fourteenth Amendment. (*Id.* ¶ 29.)[3] WMC seeks summary judgment on these two counts on the ground that WMC is a private, non-profit corporation whose conduct is not within the reach of the Fourteenth Amendment.

■ Without question the Fourteenth Amendment applies only to actions that may fairly be said to be those of the "States" and not to actions of private individuals or entities. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948); *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883).

■ Thus, it is necessary to carefully examine the undisputed facts to determine whether the WMC's alleged negative evaluation and constructive discharge of plaintiff can be said to have been state actions. The undisputed facts show that WMC has never received any financial assistance from local, state or federal governments. (D.I. 41, ¶ 2.) Although WMC is reimbursed for cost of care provided to patients eligible for medicare and medicaid programs, WMC does not receive any other kinds of government funds, including construction funds under the Hill-Burton Act, 42 U.S.C. § 291 *et seq.* (*Id.* ¶¶ 3, 4 & 5.)

The receipt of medicare and medicaid funds is insufficient to convert WMC's private actions into conduct actionable under the Fourteenth Amendment. *See Blum v. Yaretsky,* —— U.S. ——, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). In *Blum,* the Court held that a private nursing home's conduct was not state action despite the home's dependence upon funding by the State of New York. Similarly, in a companion case, *Rendell-Baker v. Kohn,* —— U.S. ——, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court rejected the argument that the conduct of a private school which derived virtually all of its income from state funding was state action. The receipt of state funds, according to the Supreme Court, did not make the acts of the private nursing home or private school acts of the States.

> The school, like the nursing homes, is not fundamentally different from any private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships, or submarines for the government. Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts.

—— U.S. at ——, 102 S.Ct. at 2770. Thus, WMC's receipt of medicare and medicaid funds does not render its conduct state action.

---

**3.** Freedom of speech and freedom of press, which are protected by the First Amendment from infringement by Congress, are also protected by the Fourteenth Amendment from invasion by state action. *Lovell v. City of Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938). The Fourteenth Amendment provides directly in pertinent part that "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." While plaintiff refers to the Fifth Amendment's due process and equal protection clauses, it adds nothing to this action in view of the alleged violations of the Fourteenth Amendment.

Furthermore, the fact that WMC is licensed by the State and is subject to state health regulations is likewise insufficient as a matter of law to render WMC's conduct towards plaintiff's state action. In *Blum, supra,* the Supreme Court held that:

"[t]he mere fact that a business is subject to state regulation does not by itself convert its action to that of the State for purposes of the Fourteenth Amendment."
... The complaining party must also show that "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." ...
The purpose of this requirement is to show that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains
. . . .

—— U.S. at ——, 102 S.Ct. at 2785 (emphasis in original) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 351, 95 S.Ct. 449, 433, 42 L.Ed.2d 477 (1974)). The Court went on to hold that "a State can normally be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.*

The undisputed facts before the Court indicate that the State played no part in WMC's conduct of which plaintiff complains. The operations of WMC are directed by a Board of Directors, none of whom are appointed or chosen by a governmental official or body. (D.I. 41, ¶ 6.)[4]

Moreover, other than general business and health regulations applicable to all employers, there is no showing of state involvement in the promulgation or administration of WMC's personnel policies, including those challenged by plaintiff here. (D.I. 40, ¶¶ 3 & 4.) Under this factual showing, it is clear that the State was not responsible in any way for WMC's private decisions with respect to plaintiff's employment. There is no evidence that the State inspired or encouraged, either overtly or covertly, WMC's specific conduct of which plaintiff complains.

In addition, plaintiff's contention that WMC performs a public function is erroneous as a matter of law. As the Court stated in *Blum, supra,* "[w]e are also unable to conclude that the nursing homes perform a function that has been 'traditionally the exclusive prerogative of the State.'" —— U.S. at ——, 102 S.Ct. at 2790. The Supreme Court went on to note that the decisions made in the day-to-day administration of a nursing home are not "the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public. Indeed, respondents make no such claim, nor could they." *Id.* Thus, plaintiff's assertion that WMC's conduct is state action is contrary to both the facts and the controlling precedent.

In fact, on several occasions, this Court has previously recognized WMC's status as a private nonprofit hospital. In *Antinoro v. Wilmington Medical Center, Inc.,* Civil Action No. 74–162 (D.Del.1975) (D.I. 42, Ex.), Judge Stapleton rejected an effort by the plaintiff, a former nurse at WMC, to convert WMC's conduct into state action.[5] In a thorough decision, the Court held that WMC's receipt of government funds, its tax exempt status, the fact that WMC is licensed by the State and subject to regulation therewith, and the

---

**4.** Plaintiff points out that the present Governor of Delaware served as a trustee of WMC from 1968–1970 while he was a representative in the Delaware General Assembly and in 1970–1971 when he was a member of the U.S. House of Representatives. (D.I. 52.) He has not served in any capacity at WMC since 1971 (D.I. 41). In any event, there is no evidence showing that he had anything to do with WMC's conduct of which plaintiff complains.

**5.** *Antinoro* was a civil rights action brought under 42 U.S.C. § 1983. However, § 1983 requires the same "state action" as the Fourteenth Amendment. *Lugar v. Edmundson Oil Co.,* —— U.S. ——, ——, 102 S.Ct. 2744, 2748, 73 L.Ed.2d 482 (1982); *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1156 n. 7, 16 L.Ed.2d 267 (1966).

fact that WMC treated, at that time, approximately 85% of all people in New Castle County were insufficient to cause WMC's actions to rise to the level of state action. The Court stated:

> It would render the private-public distinction meaningless if each subject of state regulation and each recipient of state funds or tax benefits including sole proprietorships and welfare recipients, were deemed to be an arm of the state .... Plaintiff has not met the burden of demonstrating a nexus between the State's involvement which led to Plaintiff's discharge. Consequently, it cannot be said that the defendant's acts were taken "under color" of State law.

Slip Op. at 10–11.

More recently, in *National Association for the Advancement of Colored People v. Wilmington Medical Center, Inc.,* 436 F.Supp. 1194 (D.Del.1977), *aff'd,* 584 F.2d 619 (C.A. 3, 1978), the plaintiff sought to convert WMC's activity into "federal action" so as to invoke certain obligations under federal regulations. This Court, after noting that "Plaintiffs appeared to draw on the 'state action' doctrine," 436 F.Supp. at 1202 n. 7, rejected plaintiff's "novel theory" and held:

> The WMC is a private entity that provides medical services for patients entitled to federal financial assistance, and the federal government exercises some limited control over the quality of health care provided and the manner in which it is delivered. Many of the requirements imposed on the WMC are similar to the standards which any federal contractor must meet. In essence, plaintiffs are urging upon the Court a new doctrine that would make federal the actions of most hospitals and any other entities that have been traditionally viewed as nonfederal. The power which Congress has chosen to exercise over the WMC is not sufficient to make [WMC's] Plan Omega a federal project.

436 F.Supp. at 1203.

These decisions are also consistent with applicable precedent of the Court of Appeals for the Third Circuit. In *Hodge v. Paoli Memorial Hospital,* 576 F.2d 563 (C.A. 3, 1978), the court adopted the view of the majority of the Circuit Courts of Appeals and squarely held that a hospital's receipt of medicare and medicaid funds and Hill-Burton construction funds, its tax exempt status and the fact that it was subject to state licensing requirements for non-profit hospitals did not convert the hospital's action into state action as a matter of law.

Finally, the plaintiff seems to argue that there is a "symbiotic relationship" between WMC and the State similar to the relationship involved in *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). This argument, however, must be rejected for the same reasons given in *Rendell-Baker v. Kohn, supra:*

> Fourth, petitioners argue that there is a "symbiotic relationship" between the school and the State similar to the relationship involved in *Burton v. Wilmington Parking Authority,* 365 U.S. 715 [81 S.Ct. 856, 6 L.Ed.2d 45] (1961). Such a claim was rejected in *Blum v. Yaretsky,* and we reject it here. In *Burton,* the Court held that the refusal of a restaurant located in a public parking garage to serve Negroes constituted state action. The Court stressed that the restaurant was located on public property and that the rent from the restaurant contributed to the support of the garage. *Id.,* [365 U.S.] at 723 [81 S.Ct. at 860]. In response to the argument that the restaurant's profits, and hence the State's financial position, would suffer if it did not discriminate, the Court concluded that this showed that the State profited from the restaurant's discriminatory conduct. The Court viewed this as support for the conclusion that the State should be charged with the discriminatory actions. Here the school's fiscal relationship with the State is not different from that of many contractors performing services for the government. No symbiotic relationship such as existed in *Burton* exists here.

—— U.S. ——, 102 S.Ct. 2771.

The same is true in this case; no symbiotic relationship such as existed in *Burton* exists here.

Accordingly, in light of the Supreme Court's decisions in *Blum* and *Rendell-Baker,* the Court finds as a matter of law on the undisputed facts that the conduct allegedly engaged in by WMC with respect to plaintiff was not state action. WMC is therefore entitled to summary judgment on Counts VII and VIII.

The Court now turns to a consideration of the remaining Counts of plaintiff's complaint since the Court is vested with discretion to exercise pendent jurisdiction over the additional non-federal counts asserted by plaintiff. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### III. *Count I—Breach of Contract.*

In Count I plaintiff contends that in forcing her to resign and by giving her a "retaliatory negative evaluation," WMC breached "her contract with respect to the terms and conditions of her employment with defendant." (D.I. 1, ¶ 21.) Specifically, plaintiff alleges that WMC breached its employees' handbook which establishes a grievance procedure and assures employees against reprisals for use of such procedures. (D.I. 54, Ex.)

WMC contends it is entitled to summary judgment on this Count, as a matter of Delaware law, because, first, even conceding that plaintiff was "forced" to resign, her employment was terminable at will, and second, that as a matter of Delaware law, WMC's employee handbook did not give rise to a contractual relationship with WMC. The Court agrees.

Plaintiff testified that at the time she was employed by WMC, she was not given a written contract of employment or given anything in writing describing the terms and conditions of her employment with WMC. (D.I. 54, pp. 34, 36). Moreover, plaintiff admitted that she was hired for an indefinite duration with no limits placed on her employment (*id.* p. 35), except that she was merely informed orally "we're glad that you are here with us and we hope that you will remain." (*Id.*) Plaintiff further testified that she was aware when she began working that she was free to leave the employment of WMC at anytime by giving one or two weeks' notice. (*Id.* p. 36.) Indeed, plaintiff's testimony supports the verified statement of the Director of Personnel at WMC that she was not given a written contract of employment. (D.I. 9, ¶ 1.)

Under Delaware law, it has long been settled that an oral contract of employment for an indefinite period is a hiring at will which may be terminated at anytime with or without cause. This was stated in *Haney v. Laub,* 312 A.2d 330, 332 (Del.Super.1973) as follows:

> The law governing oral contracts of employment for an indeterminate term is well settled. A hiring for an indeterminate period is a hiring at will and, consequently, is terminable at the will of either party with or without cause. *Drake v. Hercules Powder Co.,* Del.Super., 5 Terry 69, 44 Del. 69, 55 A.2d 630 (1946); *Greer v. Arlington Mills Mfg. Co.,* Del.Super., 1 Pennewill 581, 43 A. 609 (1899).

The Delaware Supreme Court recently reaffirmed this principle in *Heideck v. Kent General Hospital, Inc.,* 446 A.2d 1095, (Del. 1982) (*see* D.I. 42, Ex.). In that case, the Delaware Supreme Court held that where the plaintiff had not been hired pursuant to a written contract which set out the terms, conditions or duration of her employment, her employer never orally promised her employment for a definite length of time, and the plaintiff conceded that she did not consider herself bound to work for defendant for a fixed period of time, the plaintiff's employment was terminable at will as a matter of settled Delaware law. At 1096.

The plaintiff, as previously noted, also asserts that the WMC employee handbook constitutes a contractual limitation upon WMC's right to discharge plaintiff. (*See* D.I. 54, Ex. 6 for handbook provisions.) However, plaintiff testified that the employee handbook upon which she relies was not in effect at the time she was hired by WMC; in fact she did not receive a copy until about 1976, some nine years after she

was employed. (D.I. 54, pp. 37, 39, 41.) In virtually identical circumstances, the Delaware Supreme Court held, in *Heideck v. Kent General Hospital, supra,* that an employee handbook does not alter an employee's "at will" employment status, stating:

> [T]he *Booklet* in question here was issued by defendant after plaintiff began her employment. It was a unilateral expression of the defendant's policies and procedures on a number of topics, issued for the guidance and benefit of employees. The *Booklet* does not grant to any employee a specific term on employment and does not, therefore, alter plaintiff's "at will" employment status. No error was committed by the Superior Court in awarding summary judgment for defendant.

446 A.2d at 1097.

As the Delaware Supreme Court recognized, its decision that employee handbooks do not alter the traditional employment at will doctrine is consistent with the rulings in numerous other jurisdictions. *See e.g., Beidler v. W.R. Grace, Inc.,* 461 F.Supp. 1013 (E.D.Pa.1978), *aff'd mem.* 609 F.2d 500 (C.A. 3, 1979); *Johnson v. National Beef Packing Company,* 220 Kan. 52, 551 P.2d 779 (1976); *Sargent v. Illinois Institute of Technology,* 78 Ill.App.3d 117, 33 Ill.Dec. 937, 397 N.E.2d 443 (1979).

■ Therefore, it is clear that Delaware, along with the majority of other jurisdictions, continues to adhere to the well-established rule that oral hirings for an indefinite period of time are hirings at will. In light of plaintiff's testimony that she was not employed pursuant to a written agreement for a determinate term, it is clear that her term of employment was at will and this type of employment, as a matter of Delaware law, was not altered by the later issue of an employee handbook. According-

ly, WMC is entitled to summary judgment on Count I.[6]

### IV. Counts III and IV—Libel, Slander and Defamation.

Plaintiff in Counts III and IV alleges that WMC's negative job evaluation "which suggested that plaintiff did not follow hospital policy and was an ineffective administrator," was libelous, slanderous and defamatory. (D.I. 1, ¶ 18.) WMC contends, among other things, that based upon plaintiff's deposition testimony, these counts are barred by the two-year period of limitations established by 10 *Del.C.* § 8119.[7]

In *De Moss v. News-Journal Company,* 408 A.2d 944 (Del.Sup.1979), the Delaware Supreme Court held that the limitations period applicable to libel actions is the two-year period prescribed in § 8119. Even before *De Moss,* this Court in construing Delaware law had held that the 2-year statute of limitations in § 8119 applied to actions for libel, slander and defamation. *See Smith v. Goldstein,* 447 F.Supp. 1244 (D.Del. 1978); *Read v. Baker,* 430 F.Supp. 472 (D.Del.1977); *McNeill v. Tarumianz,* 138 F.Supp. 713 (D.Del.1956).

This case was commenced on August 28, 1980, when plaintiff's complaint was filed in the Delaware Superior Court (D.I. 1). At her deposition, plaintiff testified that the only basis for her claim of libel, slander and defamation is the performance evaluation prepared by Mrs. Skinner on July 2, 1978 and discussed with plaintiff on July 10, 1978 and a job reference provided by WMC to the Veterans Administration Hospital on August 11, 1978. (D.I. 38, Ex. 6 & 7; DX 38, p. 66). Furthermore, plaintiff specifically stated that she is not aware of any allegedly libelous, slanderous or defamatory conduct which occurred after August 11, 1978 when the job reference was prepared by WMC. (D.I. 38, pp. 71–72.)

> [n]o action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of 2 years from the date upon which it is claimed that such alleged injuries were sustained . . . .

---

**6.** Plaintiff's reliance on the U.S. Magistrate's Report (D.I. 18) is misplaced. At the time the Magistrate's Report was filed, the Delaware Supreme Court had not ruled in *Heideck* on the effect of an employee's handbook.

**7.** Title 10 *Del.C.* § 8119 provides in relevant part:

■ Based on these admissions, the Court is convinced that Counts III and IV are barred by the Delaware 2-year limitation period and that WMC is entitled to summary judgment as a matter of Delaware law on those two counts.

### V. Count V—Intentional and/or Negligent Infliction of Mental Distress.

■ In Count V, plaintiff alleges that the circumstances surrounding her negative job evaluation and her resignation is indicative of WMC's intentional and/or negligent infliction of mental stress. WMC contends that the plaintiff's own admissions show that the essentials of these torts are lacking.

The tort of the intentional infliction of mental distress is defined in Restatement of Torts 2d § 46(1) as follows:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

*See also King v. Government Employees Insurance Company,* Civil Action No. 75–315 (D.Del.1978) (D.I. 42, Ex.).

First, plaintiff's admissions during her deposition testimony clearly demonstrates that she suffered no emotional distress or bodily or physical harm as a result of WMC's conduct. She testified that she did not become "physically ill as a result of this evaluation and [her] demotion and leaving," that she did not have a nervous breakdown, that she did not consult a psychiatrist or psychologist (D.I. 38, pp. 127–128). Indeed, plaintiff conceded that the only physical or emotional impact upon her for the events leading to her leaving WMC were "strong feelings" about what happened. (*Id.*)

Second, WMC's conduct, as a matter of law, is insufficient to constitute conduct "so outrageous in character and so extreme in degree, as to be beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Restatement Torts 2d § 46, Comment d. Comment d goes on to state:

> [l]iability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion . . . .

Plaintiff's own testimony thus negates any basis for permitting the plaintiff to prevail on her claim of intentional infliction of emotional stress.

■ As already noted, plaintiff alternatively alleges the tort of negligent infliction of mental distress. An essential element of that tort is that the victim not only suffer mental stress, but also bodily injury or sickness. *Robb v. Pennsylvania Railroad Company,* 210 A.2d 709 (Del.Sup.1965); *Cosgrove v. Beymer,* 244 F.Supp. 824 (D.Del. 1965). Since plaintiff testified that she suffered no mental stress or physical injury as a result of the evaluation of her performance and separation from WMC (D.I. 38, pp. 127–128), essential elements of this tort are lacking as a matter of law. Accordingly, WMC is entitled to summary judgment on Count V.

### VI. Count VI—Invasion of Privacy.

The plaintiff in Count VI alleges that WMC's conduct above described amounted to an invasion of plaintiff's privacy.

In *Barbieri v. News-Journal Company,* 189 A.2d 773 (Del.1963), the Delaware Supreme Court recognized, for the first time, the tort of invasion of privacy as an element of Delaware law and adopted Professor Prosser's delineation of the nature of this tort. The following conduct was held to give rise to a cause of action: (1) intrusion on plaintiff's physical solitude; (2) publication of private matters violating the ordinary senses; (3) putting plaintiff in a

false position in the public eye; and (4) appropriation of some element of plaintiff's personality for commercial use. 189 A.2d at 774. *See also Reardon v. News Journal Company,* 3 Storey 29, 164 A.2d 263 (Del. 1960); *Guthridge v. Pen-Mod, Inc.,* 239 A.2d 709 (Del.Super.Ct.1967).

During her deposition, plaintiff testified that the sole basis upon which she contends that her right to privacy was invaded by WMC is the fact that, after she was separated from WMC, several persons asked her why she had left the Medical Center. Plaintiff stated that, in her opinion, "every time someone asks, my privacy is infringed upon . . . ." (D.I. 38, p. 130.) Clearly, the mere fact that plaintiff was asked by others why she left the Medical Center is insufficient, as a matter of law, to constitute the tort of invasion of privacy. Based on plaintiff's admissions, WMC has not engaged in any conduct which would give rise to a cause of action for invasion of privacy and summary judgment must be entered in favor of WMC on Count VI.

An order will be entered in accordance with this Memorandum Opinion.