Juan **CORREA** and Doris Correa, his wife, and Dora Marie Lillard, Plaintiffs,

v.

**PENNSYLVANIA MANUFACTURERS ASSOCIATION INSURANCE COMPANY, a foreign corporation licensed to do business in the State of Delaware, Defendant.**

**Civ. A. No. 84–593–WKS.**

United States District Court, D. Delaware.

Sept. 9, 1985.

John J. Schmittinger, Kevin M. Howard, Douglas W. Lundblad, Schmittinger & Rodriguez, Dover, Del., for plaintiffs.

J.R. Julian, Roger A. Brown, J.R. Julian, P.A., Wilmington, Del., for defendant.

## OPINION

STAPLETON, Circuit Judge: [1]

This is a diversity action brought by Juan Correa, together with his wife, Doris Correa, and Dora Marie Lillard (together "plaintiffs") against Pennsylvania Manufacturers Association Insurance Company ("PMA").[2] Plaintiffs seek to recover from PMA allegedly unpaid worker's compensation medical benefits and damages for, *inter alia,* emotional distress caused by PMA's alleged bad faith towards and unfair dealing with the plaintiffs. PMA has moved to dismiss the complaint for failure to state a claim upon which relief can be granted, and, in the alternative, for summary judgment. For the reasons set forth hereinafter, PMA's motion will be granted in part and denied in part.

## BACKGROUND

On March 12, 1983, Juan Correa was injured in an industrial accident while employed by Steiner & Company ("Steiner"). On January 6, 1984, PMA accepted, on behalf of Steiner as its insurer, Correa's injury as a compensable industrial accident and agreed to pay temporary total disability benefits as well as all medical expenses related to the accident. The amount of the disability benefits was fixed pursuant to an agreement entered into by Correa and Steiner at about the same time.

Dora Marie Lillard was injured in an industrial accident on March 19, 1975, while employed by the Delaware Home & Hospital ("DH & H"). Following this injury, Lillard and DH & H entered into an agreement as to compensation, thereby rendering Lillard eligible for benefits under her employer's worker's compensation insurance policy with PMA.

It is undisputed that both Juan Correa and Dora Marie Lillard are entitled to receive worker's compensation benefits from PMA as a result of their injuries. Correa and Lillard both assert, however, that notwithstanding their undisputed right to receive such benefits from PMA, PMA has systematically refused to pay and/or delayed paying bills for compensable medical treatment relating to the industrial accidents suffered by Correa and Lillard.

More specifically, Correa alleges in the complaint that on twelve different occasions since PMA assumed coverage for payment of worker's compensation benefits arising out of Correa's accident, Correa submitted to PMA bills for compensable medical treatment in the total amount of $1,173.60 which PMA has failed to pay. Correa further alleges that as a result of PMA's failure to pay these medical bills, the Dickinson Medical Group brought suit against Correa and his wife and obtained a judgment in its favor for $759.60 plus costs. Correa contends in Count I of the complaint that this failure by PMA to pay compensable medical expenses constitutes a wrongful termination of compensation benefits in violation of 19 Del.C. § 2347 (1979). Hence, according to Correa, he is entitled to the remedies available under 19 Del.C. § 2357 (1979) *including attorneys'* fees, court costs, liquidated damages, and "all general, special and consequential damages" arising out of PMA's breach of duty. Complaint, ¶ 31. In addition, in Count II of the complaint, Correa asserts that PMA's failure to pay medical benefits was done "unreasonably, intentionally, wrongfully, and maliciously," Complaint, ¶ 37, and that consequently, PMA breached its duty of

---

1. Honorable Walter K. Stapleton, United States Circuit Judge for the Third Circuit, sitting by designation.

2. Plaintiffs are citizens of Delaware while PMA is a Pennsylvania corporation having its principal place of business in Pennsylvania. Plaintiffs' complaint asserts that the amount in controversy is in excess of $10,000.00 exclusive of interests and costs. Hence, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

good faith and fair dealing owed to him and is guilty of intentional infliction of emotional distress. Finally, Correa claims that as a result of PMA's "bad faith and outrageous conduct," his physicians have refused to treat him and that both he and his wife have suffered emotional distress, loss of reputation, and an impairment to their credit rating, thereby entitling Correa and his wife to damages. Complaint, ¶¶ 42, 43.

Dora Marie Lillard sets forth similar allegations. In Count III of the complaint, she claims that on fourteen separate occasions she submitted to PMA compensable medical bills in the amount of $523.05 which PMA has failed and refused to pay. Moreover, Lillard alleges that on June 9, 1981, she was forced to file a petition with the Delaware Industrial Accident Board ("Board") to hold PMA in contempt for failure to pay medical bills, but that the petition was voluntarily dismissed upon PMA's promise to satisfy the outstanding medical expenses and to abide by its continuing obligations. Similarly, in March, 1982, Lillard claims she was again forced to file a petition with the Board because PMA, "without reason or justification," denied payment of a medical bill owed to Ash Memorial Hospital. As with the earlier petition, this petition was voluntarily dismissed after PMA agreed to pay the bill. According to Lillard, this pattern of conduct constitutes unreasonable claims settlement practices by PMA and evidences an ill will and malice toward her. In addition, Lillard asserts that the failure to pay these compensable medical expenses constitutes a wrongful termination of compensation benefits under 19 Del.C. § 2347 (1979), and therefore, she is entitled to the remedies provided for by 19 Del.C. § 2357 (1979). Lillard also claims, in Count IV of the complaint, that PMA, in failing to pay properly compensable medical bills, acted "unreasonably, intentionally, wrongfully and maliciously," Complaint, ¶ 74, in breach of its duty of good faith and fair dealing owed to her. Furthermore, Lillard alleges that such conduct constitutes intentional infliction of emotional distress. As a result, Lillard asserts that she has suffered severe emotional distress, loss of reputation, and impairment to her credit rating and is therefore entitled to damages.

In response, PMA has raised a plethora of alleged legal defects with the claims asserted by plaintiffs. In addition, PMA has attacked the factual basis for plaintiffs' claims through an affidavit of Patrick J. Duffy, the PMA claims supervisor in charge of handling Correa's and Lillard's worker's compensation claims. With respect to Correa, PMA through Duffy asserts that as of October 2, 1984, "the only outstanding medical bill received but not paid by PMA [on behalf of Correa] was from the Dickinson Medical Group in the amount of $775.60 which was being held pending receipt of medical substantiation." Duffy Aff., ¶ 4(q). Therefore, according to PMA, far from refusing to pay Correa's compensable medical bills, PMA has conscientiously paid all bills that have been submitted to it and that have been substantiated.

As to Lillard, PMA concedes that it did not promptly pay a $35.00 medical bill from Baker & Zimmerman, but that the remaining factual allegations raised by Lillard in the complaint are simply incorrect. PMA contends, relying on Duffy's affidavit for support, that all but three of the bills submitted to it by Lillard had been paid at the time suit was filed, and that of the three bills which had not been paid, two were paid in November, 1984, approximately one month after the suit was brought, and the other was never substantiated.

## DISCUSSION

### A

Counts I and III and to some degree Counts II and IV of the complaint rest on the contention that failure by PMA to pay allegedly compensable medical expenses incurred by plaintiffs constitutes a wrongful termination of compensation benefits in violation of 19 Del.C. § 2347 (1979). That statutory provision provides in relevant part as follows:

On the application of any party in interest on the ground that the incapacity of the injured employee has subsequently terminated, increased, diminished or recurred or that the status of the dependent has changed, the Board may at any time, but not oftener than once in 6 months, review any agreement or award.

On such review, the Board may make an award ending, diminishing, increasing or renewing the compensation previously agreed upon or awarded, and designating the persons entitled thereto, subject to this chapter, and shall state its conclusions of facts and rulings of law. The Board shall immediately send to the parties a copy of the award by personal delivery or by registered mail.

\* \* \* \* \* \*

Compensation payable to an employee, under this chapter, shall not terminate until or unless the [Industrial Accident] Board enters an award ending the payment of compensation after a hearing upon review of an agreement or award, provided that no petition for review, hearing or an order by the Board shall be necessary to terminate compensation where the parties to an award or an agreement consent to the termination. 19 Del.C. § 2347 (1979).

Plaintiffs rely on the last quoted paragraph. Since it is undisputed that PMA's alleged refusal to pay compensable benefits occurred without the consent of the plaintiffs and without a hearing on the merits and an appropriate order by the Board, plaintiffs assert that PMA's refusal to pay compensable medical expenses was a termination of compensation in direct contravention of 19 Del.C. § 2347 (1979).

More specifically, in plaintiffs' view, the proper construction to be given to 19 Del.C. § 2347 (1979) and 19 Del.C. § 2357 (1979)[3] is that where a claimant submits a bill to his or her employer or the employer's insurer and makes a demand for payment, the employer or insurer has thirty days in which to take a position as to payment. Plaintiffs contend that in the event that the employer or insurer takes the position that no payment is required, then the employer or insurer must petition the Board to review this decision and only if the Board confirms that no payment is necessary may the employer or insurer refuse reimbursement. Absent such an order by the Board, plaintiffs assert, a claimant has the right to bring suit in court pursuant to 19 Del.C. § 2357 (1979) provided that his or her claim has not been satisfied within 30 days of demand. Hence, according to plaintiffs, under this interpretation of the statutory framework and the teachings of *Huffman v. C.C. Oliphant & Son, Inc.*, 432 A.2d 1207 (Del.1981), they are entitled to maintain this suit under 19 Del.C. § 2357 (1979) and thereby invoke the remedies provided for in 19 Del.C. § 1113 (1979) for claims to recover unpaid wages.

In response, PMA contends that the remedies provided for in 19 Del.C. § 2357 (1979) are unavailable to plaintiffs since there has never been any "amount due under this chapter," the nonpayment of which for 30 days following a demand for payment entitles a claimant to proceed in the same manner as on claims for unpaid wages. Implicit within this contention is the hypothesis that medical bills are not "compensation" within the meaning of 19 Del.C. § 2347 (1979) which must be paid absent an agreement between the parties or an order by the Board to terminate such compensation. The crux of PMA's position is that medical bills do not become "due under this chapter" within the meaning of 19 Del.C. § 2357 (1979) until the parties have agreed on the amount payable or until there has been a hearing before the Board pursuant to 19 Del.C. § 2346 (1979)[4] and

---

**3.** 19 Del.C. § 2357 (1979) provides as follows: If default is made by the employer for 30 days after demand in the payment of any amount due under this chapter, the amount may be recovered in the same manner as claims for wages are collectible.

**4.** 19 Del.C. § 2346 (1979) provides as follows: If any person charged with the payment of surgical, medical, dental, optometric, chiropractic or hospital services, medicines and supplies, and the person to whom the same is due and payable fail to reach an agreement in

the Board has made a determination of the amount for which the employer or the employer's insurance carrier is responsible.

In *Huffman v. C.C. Oliphant & Son, Inc., supra,* the Delaware Supreme Court ruled that where a worker's compensation insurance carrier unilaterally stopped all payment of worker's compensation benefits to an injured employee in contravention of a compensation agreement entered into between the employee and the insurer and approved by the Board, the employee was entitled to proceed in Superior Court under 19 Del.C. § 2357 (1979). The court noted that the insurer had terminated payment of benefits on the theory that the employee was no longer entitled to benefits because he had unreasonably refused an offer of employment suitable to his capacity. *See* 19 Del.C. § 2353(c) (1979). The court held, however, that the insurer's "good faith" belief that the employee was no longer entitled to compensation was irrelevant, since, absent the consent of the employee, the determination as to whether compensation should be suspended or terminated was reserved for the Board. Hence, the court concluded that the insurer had clearly violated 19 Del.C. § 2347 (1979) by unilaterally terminating the payment to the injured employee of all worker's compensation benefits.

The court then went on to discuss the remedies available for the wrongful termination of benefits, finding that although the Board had jurisdiction to entertain such matters, the legislature had intended to provide an additional remedy to employees in such situations by giving the employee the right to elect to proceed under 19 Del.C. § 2357 (1979) in a court of law rather than before the Board. The court emphasized that the remedies provided for under 19 Del.C. § 2357 (1979) were available only in the courts and were considerably broader than those available in proceedings before the Board. Thus, it was reversible error for the lower court to con-

clude that the courts and the Board had concurrent jurisdiction over Section 2357 actions and, as a result, to dismiss the injured employee's action in deference to Board expertise.

■ Since *Huffman,* there can be little question that where an employer or its insurer terminates payment of compensation in violation of 19 Del.C. § 2347 (1979), and a claimant makes a proper demand for payment which is unsatisfied for a period of 30 days, the claimant may elect to proceed before the courts under 19 Del.C. § 2357 (1979). However, *Huffman* does little to shed light on the threshold issue of whether, as alleged here, nonpayment of compensable medical bills constitutes a termination of compensation within the meaning of 19 Del.C. § 2347 (1979). The appropriate starting point for resolving this issue is a review of the worker's compensation statute.

The Delaware worker's compensation statute is based on the twin goals of "providing a scheme for assured compensation for work related injuries without regard to fault and to relieve employers and employees of the expenses and uncertainties of civil litigation." *New Castle County v. Goodman,* 461 A.2d 1012, 1014 (Del.1983). *See also Kofron v. Amoco Chemicals Corp.,* 441 A.2d 226, 231 (Del.1982). Consistent with these goals, the statute sets forth a procedural framework for resolution of claims arising out of work-related injuries. *See generally* 19 Del.C. §§ 2341–2363 (1979). The statute also provides guidelines as to the amount and type of benefits available to injured parties. *See generally* 19 Del.C. §§ 2321–2334 (1979).

When an employee is injured, the statute contemplates that the employee and his or her employer will attempt to reach an agreement regarding the employee's entitlement to benefits including the amount of periodic payments to be made as a substitute for wages in the case of permanent or temporary disability. If such an agree-

---

regard to such charges, either party may notify the Board of the facts and the Board shall thereupon, after notice of the time and place

of hearing sent by registered mail to all parties in interest, hear and determine the matter and notify such parties of its conclusions.

ment is reached, it is submitted to the Board for approval, and if so approved, it is binding on the parties.[5]  19 Del.C. § 2344 (1984 Supp.).  However, where an injured employee and his or her employer fail to reach an agreement as to compensation or if the Board does not approve their agreement, then the Board, after a hearing, determines the amount of compensation the employee is entitled to receive.  19 Del.C. § 2345 (1979).  Once an agreement between the parties as to compensation has been approved by the Board or the Board has entered an order fixing the amount of such compensation to be paid, it is binding on the parties until modified pursuant to 19 Del.C. § 2347 (1979).

Section 2347 of the worker's compensation statute deals with the situation where someone claims that the status quo established in the initial stage of a disability proceeding should be altered because of a change in circumstances.  This section prohibits unilateral action by the employer or its insurance carrier and requires that the Board make a determination as to whether there has been a relevant change and the consequences to follow therefrom.

■ While the term "compensation" is at times used in the worker's compensation statute to refer to both fixed payments and medical benefits, it is used even more frequently in the statute to refer only to fixed benefits.[6]  I conclude that it is so used in Section 2347.  For obvious reasons, the employer's liability to pay specific bills or specific expenses is not determined at the initial stage of the disability proceeding, and, when there is a dispute over specific bills, it is not the kind of change of circumstance issue addressed in Section 2347.  As

with the amount of fixed payments, however, resolution of disputes over bills and liquidation of the amount of the employer's medical benefit liability is preserved to the Board under 19 Del.C. § 2346 (1979).

Thus, where an employer or the employer's insurance carrier takes the position that a certain medical expense is not compensable, the remedy provided for by the legislature is to seek a hearing before the Board pursuant to 19 Del.C. § 2346 (1979).  If and when the Board determines that the specific medical expense is compensable, the injured employee may then demand payment from the employer or its insurer, and if this demand is not satisfied within 30 days, invoke the remedies available under 19 Del.C. § 2357 (1979).  This reading of the statute, unlike that of the plaintiffs, preserves to employees the ultimate right to judicial enforcement while preserving the Board's jurisdiction to resolve disputes between employers and employees regarding their respective responsibilities and rights under the worker's compensation statute.

In the instant suit, it is undisputed that the Board has neither conducted a hearing nor issued an order requiring PMA to pay the allegedly compensable medical bills incurred by plaintiffs.  Moreover, I do not understand Correa and/or Lillard to have obtained from their respective employers an agreement to pay any of the specific medical bills at issue here.  Since I have found that the alleged nonpayment of medical bills in the case at bar does not constitute a termination of compensation under 19 Del.C. § 2347 (1979) and plaintiffs have not satisfied the prerequisites for maintaining a suit pursuant to 19 Del.C. § 2357 (1979), Counts I and III of the com-

---

5.  In the case at bar, it appears that under the agreements entered into between Correa and Lillard and their respective employers and approved by the Board, Correa and Lillard are entitled to receive a certain amount per week as compensation for their injuries as well as reimbursement of medical expenses.  For example, in Correa's case, PMA, as insurer, is required to pay Correa $166.14 per week for the term of his disability.  Complaint, Exh. E–1.  Plaintiffs do not assert that PMA has failed to pay these fixed weekly benefits.  Rather, the focus of plaintiffs'

suit is on the alleged nonpayment of compensable medical bills.

6.  The Delaware worker's compensation statute defines "compensation" as follows:

"compensation" *wherever the context requires it,* includes surgical, medical and hospital services, medicines and supplies and funeral benefits provided for in this chapter....

19 Del.C. § 2301(5) (1979) (emphasis added).

plaint and so much of Counts II and IV of the complaint that rest on the remedies available under 19 Del.C. § 2357 (1979) must be dismissed.

### B

The remaining portions of plaintiffs' complaint rest (1) on the argument that PMA "unreasonably, intentionally, wrongfully, and maliciously" failed and refused to pay compensable medical bills in breach of its duty of good faith and fair dealing owed to plaintiffs and (2) on the assertion that by failing to pay medical benefits, PMA committed an "outrage" giving rise to a common law claim for intentional infliction of emotional distress. Based upon these allegations, plaintiffs claim entitlement to both compensatory and punitive damages as well as costs, interest, and attorneys fees.[7]

PMA vigorously attacks the factual basis for these claims. In addition, PMA advances two principal legal challenges to plaintiffs' position. First, PMA asserts that the exclusive remedy provision of the Delaware worker's compensation statute, 19 Del.C. § 2304 (1979), bars any action at common law by an employee against a worker's compensation insurance carrier for bad faith and unfair dealing with respect to the settlement of claims. Second, PMA contends that the Delaware Unfair Trade Practices Act, 18 Del.C. § 2301, *et seq.* (1975), preempts any right of action that an employee might have to bring suit against a worker's compensation insurance carrier for bad faith settlement practices.

PMA also advances several other challenges to various parts of plaintiffs' remaining claims. PMA argues that (1) plaintiffs have failed to state a cognizable claim for emotional distress, (2) punitive damages are not appropriate in this action, and (3) Doris Correa, Juan Correa's wife, has failed to state a claim upon which relief can be granted because she is not a person

to whom PMA owes any duty of good faith and fair dealing.

### (1)

The exclusive remedy provision of the Delaware worker's compensation statute provides as follows:

> Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies.

19 Del.C. § 2304 (1979). Moreover, the statutory definition of "employer" includes an employer's insurer "as far as practicable." 19 Del.C. § 2301(10) (1984 Supp.)

As PMA reads these statutory provisions, they mandate that an injured employee's remedies against his or her employer or its insurer are limited to those provided in the worker's compensation statute. Under this view, claims for breach of a duty of good faith and fair dealing or for intentional infliction of emotional distress are barred by Section 2304.

As a federal court entertaining a diversity case, I am bound to apply the law of Delaware to the issue thus posed. Neither party has pointed to any Delaware case law directly on point, and independent research has disclosed none. However, language from a recent Superior Court opinion is helpful.

In *Nutt v. A.C. & S., Inc.*, 466 A.2d 18 (Del.Super.1983), *aff'd, Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647 (Del.1984), the central issue confronting Judge Walsh was the question of whether the exclusivity provision of the Delaware worker's compensation statute precluded a tort suit alleging that plaintiffs' employers had misled plaintiffs regarding the dangers associated with asbestos thereby causing plaintiffs to lose causes of action assertable against third parties. While holding

---

**7.** While Correa and Lillard advance almost identical contentions, Lillard adds the allegation that throughout her relationship with PMA,

PMA has engaged in unreasonable claims settlement practices evidencing ill will and malice toward her. Complaint, ¶ 70.

that the alleged actions of deceit by the defendant employers predated the physical injuries complained of, and hence, merged into the recovery afforded for these physical injuries, Judge Walsh recognized the following principles:

> Decisions in which the shield of employer immunity has been pierced are helpful in illustrating the type of employer activity which supports a common law tort action. Thus, a separate tort claim is sustainable against an employer who seeks, through collusion with an insurance carrier, to prevent the employee from pursuing a workmen's compensation claim. *See, e.g., Broaddus v. Ferndale Fastener Division,* Mich.App., 84 Mich. App. 593, 269 N.W.2d 689 (1978); *Ramey v. General Petroleum Corporation,* Cal. App., 173 Cal.App.2d 386, 343 P.2d 787 (1959). But, as was noted in *Broaddus,* the claim is limited to the emotional and mental distress occasioned by the wrongful conduct and not the physical injuries which were the basis for the underlying workmen's compensation claim. If the action is essentially a recovery for physical injury, it is barred, even if cast in the form of a non-physical tort. 2A Larson, Workmen's Compensation Law, § 68.-34(a), pp. 13.61–13.62. Similarly, if the emotional distress is simply a component of an underlying physical injury it would be recoverable only in connection with the workmen's compensation claim. A pure non-physical tort, however, could be the basis for a separate tort claim. *Battista v. Chrysler Corp.,* Del.Super., 454 A.2d 286 (1982) (defamation); *Pirocchi v. Liberty Mutual Insurance Co.,* E.D.Pa., 365 F.Supp. 277 (1973) (destruction of evidence).

466 A.2d at 22. Thus, at least one Delaware case has recognized that the exclusivity provision of the worker's compensation statute does not preclude tort actions by an employee against an employer or the employer's insurance carrier in which the injury for which compensation is sought by the employee is not a "personal injury ... arising out of and in the course of employment." 19 Del.C. § 2304 (1979).[8]

■ As the plaintiffs in this case stress, the claims they press did not arise out of and in the course of their employment. Rather, these claims are based on alleged conduct by PMA and alleged injuries to plaintiffs occurring after plaintiffs' employment had terminated. Moreover, the injuries for which recovery is sought are not components of the physical injuries which originally gave rise to plaintiffs' worker's compensation claims. Because of these facts, assuming that the Delaware Supreme Court would recognize the independent torts asserted by plaintiffs, I predict that it would find those torts outside the scope of the worker's compensation exclusivity provision, 19 Del.C. § 2304 (1979).

■ The more difficult question is whether the Delaware Supreme Court would find that a worker's compensation insurance carrier owes claimants seeking benefits under a worker's compensation insurance policy a duty of good faith and fair dealing. While this issue is one of first impression, I believe the Delaware Supreme Court would follow the better reasoned cases from other jurisdictions and recognize such a duty. *See, e.g., Stafford v. Westchester Fire Insurance Co.,* 526 P.2d 37 (Alaska 1974); *Gibson v. National Ben Franklin Insurance Co.,* 387 A.2d 220 (Maine 1978); *Hayes v. Aetna Fire Underwriters,* 187 Mont. 148, 609 P.2d 257, 8 A.L.R.4th 892 (1980); *Hollman v. Liberty Mutual Insurance Co.,* 712 F.2d 1259 (8th Cir.1983) (applying South Dakota law); *Coleman v. American Universal Insurance Co.,* 86 Wis.2d 615, 273 N.W.2d 220

---

8. *See also Battista v. Chrysler Corp.,* 454 A.2d 286, 288 (Del.Super.1982), cited in *Nutt v. A.C. & S. Inc.,* where the court set forth the requirements for application of the worker's compensation exclusivity provisions as follows:

> The exclusivity provision of § 2304 [of the Delaware worker's compensation statute] bars common law actions against an employer where: 1) plaintiff is an employee; 2) his [or her] condition is shown to be a "personal injury" within the meaning of the statute; and 3) the injury is shown to have arisen out of and in the course of employment.

(1979). I so predict because the Delaware courts have repeatedly recognized that worker's compensation claimants, unlike claimants under standard liability insurance policies, are intended to be beneficiaries of the policies against which they make claims. *See, e.g., General Motors Corp. v. Socorso,* 48 Del. (9 Terry) 418, 105 A.2d 641 (Del.Super.1953). Moreover, the Delaware courts have repeatedly noted that Delaware's worker's compensation system was designed by the legislature to ensure that employees unable to earn a living as a result of industrial accidents receive financial assistance promptly. Recognizing a duty of good faith and fair dealing owed by worker's compensation insurance carriers to claimant employees both reflects the special status of employees under the worker's compensation statute and serves the compelling interest of meeting the needs of injured employees without delay.[9]

Cases from other jurisdictions have expressly allowed employees to bring bad faith tort actions against their employers' worker's compensation insurance carriers notwithstanding the exclusivity bar. *See Hayes v. Aetna Fire Underwriters, supra,* 609 P.2d at 262, 8 A.L.R.4th at 900 ("The Compensation Act should not be a 'shield' which will insulate those who would engage in intentional wrongdoing in the settlement and investigation of workers' claims. No one should be allowed intentionally and tortiously to cut off a claimant unilaterally for whatever purpose they choose and then hide behind workers' com-

pensation exclusivity in assurance that the only retribution will come in the form of a compensation penalty paid for by society."). *See also Stafford v. Westchester Fire Insurance Co., supra; Gibson v. National Ben Franklin Insurance Co., supra; Broaddus v. Ferndale Fastner Division,* 84 Mich.App. 593, 269 N.W.2d 689 (1978); *Reed v. Hartford Accident & Indemnity Co.,* 367 F.Supp. 134 (E.D.Pa. 1973) (applying Pennsylvania law); *Hollman v. Liberty Mutual Insurance Co., supra; Coleman v. American Universal Insurance Co., supra. See generally* Annot., 8 A.L.R.4th 903 (1981).

The theoretical foundation upon which these cases rest is the premise that worker's compensation carriers owe a duty of good faith and fair dealing to the employees insured by their policies and that where an insurance carrier breaches that duty by delaying or terminating worker's compensation benefits owed to an employee, the employee suffers an injury which does not arise out of the course of his or her employment. Thus, the injury is not one to which the exclusivity doctrine is applicable.

In short, I am persuaded that the Delaware Supreme Court, if confronted with the issue before me, would recognize the right of an employee to maintain a suit to redress intentional and bad faith conduct by either an employer or the employer's insurance carrier in delaying or terminating worker's compensation benefit payments, notwithstanding the exclusivity pro-

---

**9.** The Delaware worker's compensation statute bears witness to the General Assembly's interest in deterring unjustified foot dragging and other unfair practices by employers and/or their insurance carriers. First, under appropriate circumstances, a claimant may be able to recover, pursuant to 19 Del.C. § 2357 (1979), attorneys' fees, court costs, and special liquidated damages in addition to benefits owed for nonpayment of benefits. Second, under 19 Del.C. § 2350(f) (1979), if a claimant prevails before the Board and likewise on an appeal from the Board's decision, the reviewing court may, in its discretion, award attorneys' fees to the claimant. Third, 19 Del.C. § 2362 (1979) provides that an insurance carrier or self-insurer "who neglects

or refuses to make the first payment of compensation more than 15 days after a compensable injury, such delay being avoidable or due to negligence, shall be fined not less than $100 nor more than $1000." Finally, under 19 Del.C. § 2386 (1979), an insurance carrier or employer which violates or "neglects or refuses to comply" with the Delaware worker's compensation statute is subject to fines ranging between $100 and $1000 for each such offense. While these provisions undoubtedly have a deterrent effect, there is no reason to believe that they were intended to form the entire arsenal of weapons available to claimants who suffer additional injuries as a result of intentional misconduct in the processing of their claims.

vision of the Delaware worker's compensation statute, 19 Del.C. § 2304 (1979).[10]

■ Having so concluded, I decline at this point to attempt to delineate the essential elements of such a claim. It is sufficient for present purposes to say that a trier of fact could infer from the number and extent of the delays in the payment of medical bills reflected in this record that PMA has engaged in an intentional and systematic pattern of "foot dragging" which would justify relief. I stress that this is not a necessary inference. PMA has advanced legitimate explanations for its conduct and a trier of fact could well find it to be without fault. At this stage, however, plaintiffs must be given the benefit of the permissible inferences which can be drawn from the circumstantial evidence on which they rely.

### (2)

The Delaware Unfair Trade Practices Act ("UTPA"), 18 Del.C. § 2301, *et seq.* (1975), empowers the Delaware Commissioner of Insurance ("Commissioner") to deal with unfair trade practices within the insurance industry. The UTPA specifically provides that "[n]o person shall engage in this State in any trade practice which is defined in this chapter as, or determined pursuant to this chapter to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance." 18 Del.C. § 2303 (1975). The UTPA then identifies conduct constituting unfair methods of competition and unfair or deceptive acts or practices in the insurance industry. 18 Del.C. § 2304 (1975). Included in such conduct are a number of unfair claims settlement practices. 18 Del.C. § 2304(16) (1975). Under the terms of the UTPA, the Commissioner is given broad powers to investigate and examine

the affairs of those engaged in the insurance industry. 18 Del.C. §§ 2306 and 2307 (1975). Moreover, the Commissioner is authorized, after a hearing, to issue cease and desist orders, suspend or revoke the licenses of insurance carriers, impose substantial monetary penalties on insurers,[11] and grant any other relief that is reasonable and appropriate. 18 Del.C. § 2308 (1975).

PMA asserts that the UTPA preempts any private right of action against an insurer for bad faith or unfair dealing towards a claimant unless expressly provided for in another statute such as the workers compensation statute. The thread upon which this proposition hangs is that in adopting the UTPA, the legislature made a policy determination that bad faith claims settlement practices by insurers should be addressed solely by the Commissioner to the exclusion of private suits by claimants victimized by such practices. In the absence of any Delaware authority for its position, PMA relies on *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.*, 494 Pa. 501, 431 A.2d 966 (1981).

In *D'Ambrosio*, the Pennsylvania Supreme Court held that the Pennsylvania Unfair Insurance Practices Act, 40 P.S. § 1171.1, *et seq.* (1985 Supp.), a statute similar in scope and effect to the UTPA, was sufficient to deter bad faith conduct by insurers thereby vitiating any need to recognize a private right of action based on such conduct. The insured in *D'Ambrosio* argued that the court should follow the lead of the California Supreme Court in *Gruenberg v. Aetna Insurance Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973) and recognize the right of an insured to sue his or her insurer where the insurer failed to deal fairly and in good faith with

**10.** If such intentional and bad faith conduct were sufficiently outrageous to meet the requirements of the common law tort of intentional infliction of emotional distress, recovery would similarly not be barred by 19 Del.C. § 2304 (1979).

**11.** 18 Del.C. § 2308(a)(1) (1975) allows the Commissioner to order payment of a "monetary penalty of not more than $1,000 for each and every

act or violation but not to exceed an aggregate penalty of $10,000 unless the person knew or reasonably should have known he was in violation of this chapter, in which case the penalty shall be not more than $5,000 for each and every act or violation but not to exceed an aggregate penalty of $50,000 in any 6 month period."

its insured. However, the court found as follows:

> There is no evidence to suggest, and we have no reason to believe, that the system of sanctions established under the Unfair Insurance Practices Act must be supplemented by a judicially created cause of action.... Surely it is for the Legislature to announce and implement the Commonwealth's public policy governing the regulation of insurance carriers. In our view, it is equally for the Legislature to determine whether sanctions beyond those created by the Act are required to deter conduct which is less than scrupulous.

431 A.2d at 970.

PMA argues that the analysis of the court in *D'Ambrosio* is equally applicable here. While I have some doubt whether the Delaware Supreme Court would subscribe to that analysis,[12] I need not decide that issue because a significant difference between the Pennsylvania Unfair Insurance Practices Act and the UTPA makes the analysis clearly inapposite here.

■ The UTPA provides that "[n]o order of the Commissioner pursuant to this section or order of a court to enforce it shall *in any way* relieve or absolve any person

affected by such order *from any other liability,* penalty or forfeiture *under law."* 18 Del.C. § 2308(f) (1975) (emphasis added).[13] As previously discussed, Section 2308 of the UTPA empowers the Commissioner to issue cease and desist orders, levy monetary penalties, suspend or revoke the licenses of insurance carriers or grant other reasonable and appropriate relief. 18 Del.C. § 2308(a) (1975). I read 18 Del.C. § 2308(f) (1975) as indicating that the Delaware legislature, in authorizing the Commissioner to deal with unfair trade practices in the insurance industry, did not intend to preempt other methods of redressing unfair trade practices including private party suits against insurance carriers. Rather, I believe the above noted provision evinces a legislative intent to provide an additional, supplementary means of controlling and eradicating misconduct by insurers. Pennsylvania's Unfair Insurance Practices Act contains no provision corresponding to 18 Del.C. § 2308(f) (1975).[14] As a result, I conclude that the Delaware Supreme Court would find the *D'Ambrosio* case distinguishable and would hold that the UTPA does not bar a private right of action by a worker's compensation claimant against his or her employer's insurance carrier for bad faith practices.

12. Of central importance to the court's holding in *D'Ambrosio* was the fact that the court treated the insured's claim for punitive damages as well as his claim for damages for emotional distress as aimed at deterring bad faith conduct by the insurer rather than as compensating the insured for the injuries allegedly suffered from such conduct. In short, the court viewed the insured's claims as doing nothing more than adding an additional means of deterring bad faith conduct by insurers, a goal already sufficiently satisfied by the sanctions available under the Unfair Insurance Practices Act. However, as noted in the dissenting opinion of Justice Larsen, the majority's position ignores the fact that "any sanctions imposed by the [Unfair Insurance Practices Act] would do absolutely nothing to compensate the policyholder." 431 A.2d at 973. While the Delaware courts have traditionally viewed punitive damages as designed to punish the tort feasor and deter misconduct rather than to compensate the victim for injuries he or she has sustained, they have not heretofore embraced the position, seemingly adopted by the majority in *D'Ambrosio,* that damages for intentional infliction of emotional

distress have no significant compensatory component.

13. 18 Del.C. § 2309(e) (1975) is to similar effect as 18 Del.C. § 2308(f) (1975). That provision states that "[n]o order of the Commissioner under this chapter or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability of any other laws of this State." 18 Del.C. § 2309(e) (1975).

14. As pointed out by PMA, the Pennsylvania Unfair Insurance Practices Act does provide that "[t]he powers vested in the Commissioner by this act are additional to any other powers to enforce any penalties, fines or forfeitures authorized by law with respect to methods, act and practices declared to be unfair and deceptive." 40 P.S. § 1171.13 (1985 Supp.) However, this section, like Section 2313 of the UTPA, simply provides that the powers granted to the Insurance Commissioner in the Unfair Insurance Practices Act are in addition to any other powers already vested in the Commissioner.

### (3)

PMA argues that plaintiffs have failed to state claims for intentional infliction of emotional distress because they have not alleged that PMA's conduct caused any physical injury to them. In addition, PMA asserts that, as a matter of law, the facts alleged by plaintiffs are not sufficiently outrageous to support claims for intentional infliction of emotional distress.

Delaware has long recognized a distinction between actions for mental distress caused by intentional conduct and actions for mental distress caused by negligent conduct. In *Boyle v. Chandler*, 33 Del. (3 W.W. Harr.) 323, 138 A. 273 (1927), the court held that damages for mental suffering resulting from negligent actions were not recoverable. The court then stated:

[I]t has been laid down as the law, that in a case of wilful or wanton wrongs, and those committed with malice and with an intention to cause mental distress, damages are, as a general rule, recoverable for mental suffering, *even without bodily injury*, and though no pecuniary damage is alleged or proved. And in general damages for mental anguish and suffering are recoverable where the act complained of was done with such gross carelessness or recklessness as to show an utter indifference to the consequences, as when they must have been in the actor's mind.

33 Del. at 329, 138 A. at 276 (emphasis added).

The rule set forth in *Boyle v. Chandler* regarding mental distress occasioned by negligent conduct has since been modified to allow recovery in certain limited circumstances for physical injury or sickness resulting from the mental distress. *See Robb v. Pennsylvania Railroad Co.*, 58 Del. (8 Storey) 454, 464, 210 A.2d 709, 714–15 (1965) ("where negligence proximately caused fright, in one within the immediate area of physical danger from that negligence, which in turn produced physical consequences such as would be elements of damages if a bodily injury had been suffered, the injured party is entitled to recover under an application of the prevailing principles of law as to negligence and proximate causation"). However, the dichotomy between negligently caused mental distress and intentionally caused mental distress would appear to remain under Delaware law. *See Avallone v. Wilmington Medical Center, Inc.*, 553 F.Supp. 931, 938 (D.Del.1982) (noting that an essential element of the tort of negligent infliction of mental distress as opposed to intentional infliction of mental distress is that the victim "not only suffer mental stress, but also bodily injury or sickness").

Turning to the claims raised in the case at bar, I do not understand plaintiffs to assert that PMA is liable to them for negligently inflicting emotional distress. Rather, the thrust of plaintiffs' complaint is that PMA acted intentionally and maliciously. As just discussed, under Delaware law, plaintiffs need not show physical injury or sickness to maintain an action for intentional infliction of emotional distress. Thus, plaintiffs have stated claims upon which relief may be granted.[15]

**15.** In support of its position, PMA relies primarily on *Mergenthaler v. Asbestos Corp. of America*, 480 A.2d 647, 651 (Del.1984) in which the Delaware Supreme Court stated that "[i]n any claim for mental anguish, whether it arises from witnessing the ailments of another or from the claimant's own apprehension, an essential element of the claim is that the claimant have a present physical injury." However, this statement was made in the context of addressing claims by the wives of asbestos workers to recover for mental anguish and fear of contracting cancer as a result of their contact with asbestos-fibers in the course of laundering of their husbands' work clothes. The court ruled that since the plaintiffs had suffered no present physical injury, their claims could not be maintained.

I do not read *Mergenthaler v. Asbestos Corp. of America* to encompass the claims for intentional infliction of emotional distress raised herein. In *Mergenthaler*, the plaintiff-spouses did not allege that the defendant companies acted intentionally to injure them. Accordingly, while the statement upon which PMA relies is concededly broadly worded, it is, in my view, directed at negligent rather than intentional conduct. As such, it is consistent with legal principles long established in Delaware.

In the alternative, PMA contends that summary judgment must be entered in its favor on plaintiffs' claims for intentional infliction of emotional distress because the record does not show any facts demonstrating sufficiently outrageous conduct by PMA. In PMA's view, plaintiffs have alleged nothing more than that PMA refused to pay compensable medical bills in a prompt fashion which is not conduct going beyond reasonable grounds of decency. According to PMA, "[f]ailure to pay amounts owed is a rather common occurrence in today's society and it cannot be said that a reasonable man cannot be expected to endure such delayed payments." Defendant's Opening Brief at 23.

Restatement (Second) of Torts § 46(1) (1965) defines the tort of intentional infliction of emotional distress as follows:

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

See also Avallone v. Wilmington Medical Center, Inc., supra, 553 F.Supp. at 938. PMA quite correctly points out that in order to be actionable, the conduct causing the emotional distress must be " 'so outrageous in character and so extreme in degree, as to be beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " Avallone v. Wilmington Medical Center, Inc., 553 F.Supp. at 938 (quoting Restatement (Second) of Torts § 46 comment d (1965)). Comment d of § 46 of Restatement (Second) of Torts (1965) goes on to state:

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind.

There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Clearly, plaintiffs must shoulder an extremely heavy burden to prevail on their claims for intentional infliction of emotional distress. It may well be that a reasonable fact finder would decide that PMA's conduct in these instances is not the sort of outrageous conduct which is necessary as a predicate for establishing intentional infliction of emotional distress. However, such a determination should be based upon a full development of the surrounding facts and circumstances. I am not prepared to rule on the basis of the record as it now exists that no reasonable fact finder could determine that PMA's conduct toward plaintiffs was "atrocious and utterly intolerable in a civilized community." Avallone v. Wilmington Medical Center, supra, 553 F.Supp. at 938. Therefore, PMA's motion for summary judgment as to these claims must be denied.

### (4)

PMA asserts that plaintiffs have neither alleged nor introduced into the record facts which are sufficient to support a claim for punitive damages. In response, plaintiffs argue that the record contains facts which, at the very least, demonstrate that real questions exist as to PMA's state of mind and the reasonableness of PMA's conduct.

Under Delaware law, punitive damages are recoverable in both breach of contract and tort actions. With respect to breach of contract actions, in Casson v. Nationwide Insurance Co., 455 A.2d 361, 368 (Del.Super.1982), Judge Walsh noted that as a general rule, "[e]xemplary damages are not recoverable ... in a pure action for breach of contract," but then went on to hold that punitive damages could be recovered in "egregious cases of wilful or malicious breach of contract."

With respect to tort actions, the standard for awarding punitive damages was recently described by the Delaware Supreme Court as follows:

> Punitive damages are recoverable where the defendant's conduct exhibits a wanton or wilful disregard for the rights of plaintiff.... For defendant's conduct to be found wilful or wanton the conduct must reflect a "conscious indifference" or "I don't care" attitude.

*Cloroben Chemical Corp. v. Comegys*, 464 A.2d 887, 891 (Del.1983). *See also Eustice v. Rupert*, 460 A.2d 507 (Del.1983); *Riegel v. Aastad*, 272 A.2d 715, 718 (Del.1970).

■ I need not decide at this time whether plaintiffs' claims sound solely in tort or are based on both tort and breach of contract theories. I am satisfied that under either of the tests set forth above,[16] summary judgment is not appropriate on the basis of the record before me. Plaintiff's claims for punitive damages implicate the state of mind with which PMA acted toward plaintiffs. Moreover, while PMA advances reasons justifying their conduct with respect to payment of plaintiffs' medical bills, plaintiffs have pointed to sufficient circumstantial evidence to create a material issue of disputed fact.

### (5)

Finally, PMA asserts that even if it owes a duty of good faith and fair dealing to Juan Correa and Dora Marie Lillard, such a duty does not extend to Doris Correa. In addition, PMA argues that Doris Correa has not raised a cognizable claim for intentional infliction of emotional distress because PMA did not engage in any conduct directed at Doris Correa.

■ Construing the language of the complaint liberally, I understand Doris Correa to assert two separate tort claims; one for breach of PMA's alleged duty of good faith and fair dealing and the other for intentional infliction of emotional distress.

I am persuaded that with respect to the latter claim, Doris Correa has alleged facts that, if proven, could support a finding that PMA's course of conduct was intentionally directed at her thereby causing her to suffer severe emotional distress. As such, this is a claim upon which relief may be granted. However, I reach a contrary conclusion with respect to Doris Correa's claim based on PMA's alleged breach of its duty of good faith and fair dealing.

■ The Delaware worker's compensation statute provides a system for compensating employees injured in the workplace and certain designated relatives of employees killed in industrial accidents. Under the statutory framework these individuals are the intended beneficiaries of the insurance coverage provided to an employer by its insurance carrier. It is this fact that gives rise to the carrier's implied duty of good faith and fair dealing. Doris Correa is not an injured employee or a designated relative of a deceased employee. For this reason, I predict that the Delaware Supreme Court would not extend PMA's obligation to act fairly and in good faith to Doris Correa. *See Physicians & Surgeons Hospital, Inc. v. Leone*, 399 So.2d 806 (La. App.), *cert. denied*, 401 So.2d 993 (La.1981) (holding that a worker's compensation insurance carrier owes no duty to an injured employee's spouse). Therefore, PMA's motion to dismiss Doris Correa's claim for bad faith claims settlement practices will be granted.

### CONCLUSION

For the foregoing reasons, PMA's motion to dismiss, and, in the alternative, for summary judgment will be granted with respect to Doris Correa's claim that PMA breached its duty of good faith and fair dealing owed to her. As to all other claims raised by plaintiffs, PMA's motion will be denied.

**16.** Judge Wright in *Reiver v. Murdoch & Walsh, P.A.*, C.A. No. 83–560–CMW (D.Del. Jan. 7, 1985) has provided a thoughtful discussion of the difficulties in utilizing the two standards discussed above which, while very similar in terms of their language, are applicable to two different types of claims.